******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., concurring. Although I agree with the result reached by the majority, I take issue with the unnecessary dicta in part I of the majority opinion regarding whether the defendant, Victor Jordan, Sr., could have gained access to the closet interior where the police ultimately found narcotics. I am compelled to address this dicta because I believe that the majority misconstrues the law applicable to searches incident to an arrest, which could have a deleterious effect on the investigation and prosecution of drug cases.

In part I of the majority opinion, after setting forth the relevant facts, the majority identifies the issue raised by the defendant on appeal, namely whether the search of the interior of the closet in which he had been found was illegal because it was not within his immediate control at the time of the search. The majority then proceeds with a discussion of what it deems the unsettled law on "what it means for an area to be within an arrestee's immediate control," and whether the requirements were met in the present case. Rather than resolving the issue on that ground, however, at the end of the discussion, the majority concludes that "the present case does not require us to weigh in on this debate. Even if we assume, without deciding, that the facts and the law should have led the trial court to suppress the evidence seized from the closet, we are fully convinced that any improper admission of the evidence is harmless beyond a reasonable doubt in light of the unchallenged evidence seized from the defendant's person."

Ordinarily, I would not question the inclusion of dicta in an opinion because, by design, it is not binding authority. See *Honulik* v. *Greenwich*, 293 Conn. 641, 645 n.5, 980 A.2d 845 (2009) ("[d]icta are [o]pinions of a [court] which do not embody the resolution or determination of the specific case before the court [and] [e]xpressions in [the] court's opinion which go beyond the facts before [the] court and therefore are individual views of [the] author[s] of [the] opinion and [are] not binding in subsequent cases as legal precedent" [internal quotation marks omitted]). Because dicta, however, can act as persuasive authority; see, e.g., *Schumann* v. *Dianon Systems, Inc.*, 304 Conn. 585, 612–14, 43 A.3d 111 (2012) (identifying federal circuit courts that followed dicta from United States Supreme Court case); *Fort Trumbull Conservancy, LLC* v. *Planning & Zoning Commission*, 266 Conn. 338, 359, 832 A.2d 611 (2003) (observing that conclusion in that case was consistent with dicta from two prior decisions of this court); and, in some instances, could be converted to controlling precedent; see *Voris* v. *Molinaro*, 302 Conn. 791, 797 n.6, 31 A.3d 363 (2011) ("[a]lthough dicta is not binding precedent . . . we may look to dicta as

persuasive authority, and, by relying on it in subsequent decisions, convert it to binding precedent" [citation omitted]); we must ensure that the dicta is correct. In the present case, although the majority purports to analyze the facts in light of the applicable law, its implication that the police acted improperly, in effect, creates a significantly higher burden on police than is prudent, particularly considering the dangerous situations in which police find themselves during custodial arrests.

The United States Supreme Court has observed that "[a] custodial arrest is fluid and [t]he danger to the police officer flows from *the fact of the arrest*, and its attendant proximity, stress, and uncertainty . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Thornton* v. *United States*, 541 U.S. 615, 621, 124 S. Ct. 2127, 158 L. Ed. 2d 905 (2004). Moreover, "[e]very arrest must be presumed to present a risk of danger to the arresting officer . . . [because] [t]here is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger." (Citation omitted.) *Washington* v. *Chrisman*, 455 U.S. 1, 7, 102 S. Ct. 812, 70 L. Ed. 2d 778 (1982).

Federal and state courts also have consistently acknowledged that "[c]ustodial arrests are often dangerous; the police must act decisively and cannot be expected to make punctilious judgments regarding what is within and what is just beyond the arrestee's grasp. Thus, searches have sometimes been upheld even when hindsight might suggest that the likelihood of the defendant reaching the area in question was slight. . . . And it has been held that an arresting officer is not obliged, before searching an arrestee's immediate vicinity, to calculate the probability that weapons or destructible evidence may be involved." (Citation omitted; internal quotation marks omitted.) *United States* v. *Lyons*, 706 F.2d 321, 330 (D.C. Cir. 1983); see also *United States* v. *Bennett*, 908 F.2d 189, 193 (7th Cir. 1990); *United States* v. *Queen*, 847 F.2d 346, 353 (7th Cir. 1988); *State* v. *Warren*, 949 So. 2d 1215, 1228 (La. 2007); *State* v. *Lanctot*, 587 N.W.2d 568, 572 (N.D. 1998). Thus, when determining whether the police have properly searched an area within an arrestee's control, the court must consider the actual situation that the police faced during an arrest and not import analysis of what the police should have known or how the police should have acted.

The majority, in its analysis of the facts, does not give proper deference to the circumstances of the defendant's arrest, instead injecting, in effect, a reasonableness standard, rather than the "realistic possibility" standard that it purports to follow. The majority discounts the knowledge that the police had about the defendant's violent past and the circumstances of the

arrest, namely, that the defendant had secreted himself in a dark, messy, and oddly shaped closet, had refused to come out of the closet when instructed to do so, obliging at least two officers to enter the closet to apprehend him, and had to be dragged out of the closet before being handcuffed. Instead, it chooses to emphasize that "it would have been extremely difficult for the defendant to gain access to the small closet" where two police officers were searching due to the fact that he "was surrounded by four police officers, some of whom were armed, and was lying facedown with his hands cuffed behind his back." The majority also remarked on the "remoteness" of the possibility of the defendant gaining access to the interior of the closet, in the process, implying that the police did not have a reasonable belief that the defendant could have gained access to the closet after being handcuffed because officers "continued to search the closet for up to ten minutes while leaving the defendant in close proximity rather than removing him from the scene." On the basis of these highlighted facts, the majority implies that the police acted improperly in searching the closet. Such an allusion is a classic example of "offering critiques with the 20/20 vision of hindsight"; (internal quotation marks omitted) *United States* v. *Harris*, 735 F.3d 1187, 1191 (10th Cir. 2013); which this court should not be so quick to do. See *United States* v. *Sharpe*, 470 U.S. 675, 686–87, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) ("[a] creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished"); *United States* v. *Bruton*, 647 F.2d 818, 823 (8th Cir.) ("[w]e should not, in the quiet of our chambers, look with eagle's eyes to spy out flaws in the officers' reasoning after the fact"), cert. denied, 454 U.S. 868, 102 S. Ct. 333, 70 L. Ed. 2d 170 (1981). Furthermore, by focusing on how long the search lasted before drugs were uncovered and the officers' decision not to remove the defendant from the room while conducting the search—which are circumstances that occurred *after* the police began the search and therefore should not be a consideration in whether the police were justified in conducting the search—the majority is placing on the police a higher burden than the fourth amendment to the United States constitution requires. The majority essentially implies that it needed to be *probable* that the defendant could have accessed a weapon, rather than *realistically possible* that he could be able to do so.

Moreover, the majority's suggestion that the police acted improperly cannot be reconciled with its own acknowledgment that courts have affirmed searches where arrestees were handcuffed and unable to access the searched area for a variety of reasons; see footnote 13 of the majority opinion; or with a number of cases, cited by the Court of Appeals for the Seventh Circuit

in *Queen*, where the courts upheld searches where arguably there may not have been a realistic possibility of a defendant gaining access to the searched area. *United States* v. *Queen*, supra, 847 F.2d 354. The court in *Queen* observed that "the Supreme Court—as well as several courts of appeals, including our own—have upheld searches incident to arrest where the possibility of an arrestee's grabbing a weapon or accessing evidence was *at least as remote* as in the situation before us. See, e.g., *New York* v. *Belton*, 453 U.S. 454, 456, 462–63, 101 S. Ct. [2860], 69 L. Ed. 2d 768 (1981) (arrestees removed from vehicle and separated prior to search of vehicle for narcotics); *United States* v. *Hatfield*, 815 F.2d 1068, 1071 (6th Cir. 1987) (arrestee ordered to stand against wall and guarded by officer while other officer searched vehicle); *Davis* v. *Robbs*, 794 F.2d 1129, 1130–31 (6th Cir.) (arrestee handcuffed and placed in squad car prior to seizure of rifle in house), cert. denied, 479 U.S. 992, 107 S. Ct. 592, 93 L. Ed. 2d 593 (1986); *United States* v. *Cotton*, 751 F.2d 1146, 1147–48 (10th Cir. 1985) (arrestees handcuffed and apparently guarded by officer while state trooper searched vehicle); *United States* v. *Silva*, 745 F.2d 840, 847 (4th Cir. 1984) (arrestees handcuffed and guarded by federal agents prior to search of room for weapons), cert. denied, 470 U.S. 1031, 105 S. Ct. 1404, 84 L. Ed. 2d 791 (1985); *United States* v. *Palumbo*, 735 F.2d 1095, 1096–97 (8th Cir.) (arrestee arguably handcuffed and unarguably surrounded by several officers prior to search of room for narcotics), cert. denied, 469 U.S. 934, 105 S. Ct. 332, 83 L. Ed. 2d 268 (1984); *United States* v. *Roper*, 681 F.2d 1354, 1357–59 (11th Cir. 1982) (arrestee handcuffed in hallway of motel and escorted inside room by federal agents prior to search of unlocked metal briefcase which uncovered weapon), cert. denied, 459 U.S. 1207, 103 S. Ct. 1197, 75 L. Ed. 2d 440 (1983); *United States* v. *Fleming*, 677 F.2d 602, 606–[607] (7th Cir. 1982) (arrestee handcuffed and removed from immediate area prior to search of luggage); *Virgin Islands* v. *Rasool*, 657 F.2d 582, 585, 588–89 (3d Cir. 1981) (arrestee handcuffed and removed from automobile prior to search of vehicle which uncovered weapon); *United States* v. *Garcia*, 605 F.2d 349, 352, 354 (7th Cir. 1979) (arrestee in custody of several agents when luggage seized and searched), cert. denied, 446 U.S. 984, 100 S. Ct. 2966, 64 L. Ed. 2d 841 (1980)." (Emphasis added.) *United States* v. *Queen*, supra, 354.[1]

The facts in the present case are no more or less remarkable than those cited by the court in *Queen*. Therefore, I think it is inappropriate to suggest that the police acted improperly.[2] If the majority wants to acknowledge the purported unsettled legal question of what it means for an area to be in the immediate control of an arrestee, it can do so without implying that the police in the present case acted inappropriately. By insinuating wrongdoing, but not resolving the question,

the majority opinion will have the unfortunate effect of injecting uncertainty into precarious situations, with the potential for curbing not only zealous law enforcement, but also jeopardizing the protection of the public and police officer safety. "[I]t does not make sense to prescribe a constitutional test that is entirely at odds with safe and sensible police procedures . . . ." (Citation omitted; internal quotation marks omitted.) *United States* v. *Lucas*, 898 F.2d 606, 610 (8th Cir. 1990).

Therefore, I concur.

[1] Since *Queen*, courts have continued to uphold searches when arrestees were handcuffed and unable to access an area. See, e.g., *United States* v. *Bennett*, 555 F.3d 962, 967 (11th Cir.) (suspects handcuffed behind back prior to agent's search of bed which uncovered rifle), cert. denied, 558 U.S. 831, 130 S. Ct. 64, 175 L. Ed. 2d 47 (2009); *Commonwealth* v. *Netto*, 438 Mass. 686, 694–95, 783 N.E.2d 439 (2003) (murder suspects handcuffed and removed from hotel room before police seized evidence).

[2] By implying that the police acted improperly, the majority also is indicating, but not explicitly stating, that the trial court abused its discretion in not granting the defendant's motion to suppress.